# CASES

## ARGUED AND DETERMINED

### IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS AND THE CIRCUIT AND DISTRICT COURTS.

---

### CITY OF DETROIT v. DETROIT CITY RY. CO. et al.

#### (Circuit Court, E. D. Michigan. January 5, 1893.)

1. **REMOVAL OF CAUSES—LOCAL PREJUDICE—PARTIES.**

    In a suit by the city of Detroit as sole plaintiff against a street-railway company of that city and others, some of whom are citizens of the state, praying "that the franchise be decreed to expire," and the company compelled to vacate the streets, a nonresident mortgagee of the company is entitled, under Act Aug. 13, 1888, § 2, (25 St. p. 435,) to remove the cause to a federal court when local prejudice is shown. Whelan v. Railroad Co., 35 Fed. Rep. 849, followed.

2. **SAME—LOCAL PREJUDICE.**

    The right of removal to a federal court on the ground of local prejudice extends not only to cases where such prejudice would affect the jury, but also to those in which the decisions of the judge as to questions of law or fact may be affected thereby. Burgess v. Seligman, 2 Sup. Ct. Rep. 10, 107 U. S. 33, followed.

3. **SAME—PETITION FOR REMOVAL—TIME OF FILING.**

    Under the law of Michigan, a decree by default against a nonresident, brought in by publication only, can be set aside by him as a matter of right. *Held*, that a nonresident respondent, brought in by publication, against whom an order pro confesso before decree was entered, but was afterwards set aside, could file its petition for removal to a federal court under Act March 3, 1875, at the term at which a hearing could first be had on its answer. McDonald v. McDonald, 7 N. W. Rep. 230, and Harter v. Kernochan, 103 U. S. 562, followed.

4. **SAME.**

    By the law of Michigan, where a respondent is served by publication, and is misnamed as "The Washington Trust Co.," the true name being "The Washington Trust Co. of the City of New York," an order pro confesso against such absent respondent is void, and there can be no trial on such order so as to bar its right of removal to a federal court, under Act March 3, 1875, providing that such removal must be before the trial of the suit. Guarantee Trust & Safe-Deposit Co. v. Green Cove Springs & M. R. Co., 11 Sup. Ct. Rep. 512, 139 U. S. 137, followed.

5. **SAME.**

    Chancery rule 27 of the circuit courts of Michigan gives a complainant 20 days to except against the answer, at the end of which time, if no exception is taken, the answer is deemed sufficient. Rule 45 gives a complainant 20 days after the answer is deemed sufficient to file a general

replication putting the case at issue. If no replication is filed, the cause stands for hearing on bill and answer. *Held* that, where a new term would begin before the expiration of 40 days after the filing of the answer, the respondent may at such new term remove the cause to a federal court on the ground of local prejudice, under Act Aug. 13, 1888, § 2, (25 St. p. 435,) although the complainant might have set the case down for hearing on bill and answer at the prior term, waiving its right to exceptions and a replication, no such waiver having been actually made.

6. SAME.
Under Act Aug. 13, 1888, § 2, (25 St. p. 435,) a cause may be removed to a federal court on the ground of local prejudice at any time before the first trial thereof is actually held, although such trial might have been held before the date of the application for removal. Fisk v. Henarie, 12 Sup. Ct. Rep. 207, 142 U. S. 459, explained and followed.

7. SAME—FORM OF AFFIDAVIT.
An order for removal of a cause to a federal court is interlocutory in its nature, and the affidavit need not state that the facts are sworn to of the personal knowledge of the affiant, but it is sufficient that they are of his opinion and belief, if he is a credible person, and the facts on which such belief is based are given.

8. SAME—LOCAL PREJUDICE.
On an application by a nonresident mortgagee of a street-railway company for removal of a suit against the company to a federal court, an affidavit by the applicant's agent, stating that there is prejudice and local influence; that a riot against the company has received much public sympathy; that the city authorities have refused to protect the employes and property of the company against the rioters; that a public meeting, attended by citizens of all classes and by the municipal officers, has advised the bringing of the suit; and that the judges who would try the case in the state court are shortly to stand for re-election,—shows sufficient ground for removal to a federal court.

9. SAME.
The right of removal to a federal court on the ground of local prejudice exists although the applicant, if defeated in the trial court, has the right of appeal to a state supreme court, as to which no local prejudice is alleged.

10. SAME—STATE COURT—INABILITY TO GET JUSTICE.
The fact that a decision by state judges adversely to a party would expose them to local criticism and ill will, and endanger their chances of re-election, is sufficient to show that such party will not be able to obtain justice in such court within the meaning of Act Aug. 13, 1888, § 2, (25 St. p. 435,) regulating removals from state to federal courts, irrespective of the fact that the state judges would probably rise above such local prejudice and render an entirely disinterested decision.

In Equity. Bill in the circuit court of Wayne county, Mich., by the city of Detroit against the Detroit City Railway Company, the Detroit Citizens' Street-Railway Company, Sidney D. Miller and William K. Muir, trustees, and the Washington Trust Company of the City of New York. The Washington Trust Company of the City of New York removed the cause to the federal circuit court, and it is now on motion to remand. Denied.

Charles A. Kent and Benton Hanchett, for complainant.

Henry M. Duffield, John C. Donnelly, Ashley Pond, and Otto Kirchner, for defendants.

Before TAFT, Circuit Judge, and SEVERENS and SWAN, District Judges.

TAFT, Circuit Judge. This is a motion to remand a suit in equity, which has been removed here from the circuit court of Wayne county, Mich. The averments of the bill filed by the city of Detroit, stated generally, are that the Detroit Citizens' Street Railway is in the possession and enjoyment of a franchise to operate street railways in a number of the streets of the city; that by virtue of a limitation of the constitution of the state of Michigan the franchise will expire May 9, 1893; that the railway company claims that the franchise will not expire until 1909; that the city wishes to sell the franchise at once, so as to enable the purchaser to make necessary preparations to operate railways in May, 1893, but that the claim of the company prevents the sale. The prayer of the petition is that the franchise of the company be decreed to expire as claimed by complainant, and that a mandatory injunction issue, compelling the defendant company to vacate the streets with its tracks, etc., in May, 1893. The Detroit City Railway, upon which the franchise was originally conferred, and from which, in 1891, by mesne conveyance, the present company obtained it, is made a party. Two deeds of trust conveying this franchise were given,— the one by the Detroit City Railway, in 1890, to Miller and Muir, trustees, to secure bonds amounting to $1,000,000; and the other by the Detroit Citizens' Street-Railway Company to the Washington Trust Company of the city of New York, to secure $2,000,000 of bonds. The trustees under the deeds of trust are made parties to the bill.

The bill was filed March 15, 1892. An order for service by publication on the proper affidavit was taken against the Washington Trust Company March 22d. All the defendants except the trust company were personally served, their appearances were duly entered, and their separate answers filed. The answers set forth additional details in the history of the franchises enjoyed by the railway company, deny that they will expire in May, 1893, and aver facts which are said to estop the complainant from claiming as in its bill. On August 13th, proof of publication against the Washington Trust Company was made. The notice published advised the Washington Trust Company of the pendency of a suit described as a suit of the City of Detroit against the City Railway Company, the Detroit Citizens' Street-Railway Company, Sidney D. Miller and William K. Muir, trustees, and the Washington Trust Company. An order pro confesso was taken on the same day against the Washington Trust Company. On August 19, 1892, the following entry was made in the case:

"It is hereby stipulated and agreed that the default heretofore entered in this cause against the Washington Trust Company of the City of New York, one of the defendants herein, for nonappearance in said cause, may be set aside, and that said defendant may answer to the bill of complaint filed in said cause."

On the same day the answer was filed. The corporate name of the trust company is "The Washington Trust Company of the City of New York," the words "of the City of New York" being a part thereof. On the 26th day of August the solicitor for the complainant served the solicitor for the trust company with notice that

the suit would be brought on for hearing on bill and answer at the next term of court, which would begin September 13th. On October 19, 1892, before any hearing was had in accordance with the notice, the trust company presented a petition to Judge Swan, of this court, for the removal of the suit on the ground that by reason of prejudice and local influence the petitioner could not obtain justice in the Wayne circuit court, or in any other court in the state to which, for such cause, the case could be removed. The petition states the jurisdictional facts, and refers to an affidavit accompanying it, to make it appear to the court that its averment in regard to prejudice and local influence is well founded. Upon the petition and affidavit Judge Swan made the order removing the cause as prayed. Subsequently a motion to remand the cause was made by the solicitor for the city of Detroit on the following grounds:

"(1) The cause was not subject to removal under the statutes of the United States applicable thereto. (2) The cause was not removed within the time required by said statutes; it was not removed until after the first term at which it could have been tried. (3) The affidavit and petition upon which such order was based do not contain any legal evidence of the facts therein stated. (4) The facts stated in said affidavit and petition, if true, do not offer any evidence that said Washington Trust Company, from prejudice or local influence, was not able to obtain justice in said circuit court for the county of Wayne, in chancery."

We shall consider these grounds in order.

1. The act under which this removal is to be sustained, if at all, was passed August 13, 1888, (25 St. c. 866, p. 433,) to correct the enrollment of an act approved March 3, 1887, (24 St. c. 373, p. 552.) The act is an amendment of the act of March 3, 1875, determining the jurisdiction of circuit courts of the United States, and regulating the removal of causes from state courts. By the first section the original jurisdiction of circuit courts of the United States is defined. Part of the second section is as follows:

"That in any suit of a civil nature in law or in equity arising under the constitution or laws of the United States or treaties made or which shall be made under their authority, of which the circuit courts of the United States are given original jurisdiction by the preceding section, which may now be pending or which may hereafter be brought in any state court, may be removed by the defendant or defendants therein to the circuit court of the United States for the proper district. Any other suit of a civil nature at law or in equity, of which the circuit courts of the United States are given jurisdiction by the preceding section, and which are now pending or which may hereafter be brought in any state court, may be removed into the circuit court of the United States for the proper district by the defendant or defendants therein, being nonresidents of that state. And when in any suit mentioned in this section there shall be a controversy which is wholly between citizens of different states, and which can be fully determined as between them, then either one or more of the defendants actually interested in such controversy may remove said suit into the circuit court of the United States for the proper district. And where a suit is now pending or may hereafter be brought in any state court, in which there is a controversy between a citizen of the state in which the suit is brought and a citizen of another state, any defendant being such citizen of another state may remove such suit into the circuit court of the United States for the proper district at any time before the trial thereof when it shall be made to appear to such circuit court that from prejudice or local influence he will not be able to obtain justice in such state

court, or any other state court to which the defendant may, under the laws of the state, have the right, on account of such prejudice or local influence, to remove said cause."

It has been held by the supreme court of the United States in Re Pennsylvania Co., 137 U. S. 451, 11 Sup. Ct. Rep. 141, that only suits involving $2,000 or more can be removed for local prejudice. The petition for removal shows that the necessary amount is involved. It has been held by Judge Jackson in Whelan v. Railroad Co., 35 Fed. Rep. 849, and in Thouron v. Railway Co., 38 Fed. Rep. 673, that under this act, where all the plaintiffs in a state court are citizens of the state where suit is brought, a single defendant, being a citizen of another state, may remove the case into the proper United States circuit court for prejudice and local influence, even though he is united as codefendant with citizens of the same state as the plaintiffs, and even though there is no separable controversy between the plaintiffs and the nonresident removing defendant. We understand the chief justice in the case of Wilder v. Iron Co., 46 Fed. Rep. 676, to concede and assume the correctness of the view of Judge Jackson as given above. It follows that, as the city of Detroit, the sole plaintiff here, is a citizen of Michigan, and the trust company, one of the defendants, is a citizen of New York, the order of removal, so far as the citizenship of the parties is concerned, was authorized by statute.

Counsel for complainant do not seriously dispute the correctness of the foregoing views, but the ground which they vigorously press upon the court for excluding this from the cases included within the local prejudice clause is very different. They say that the only question at issue in this suit is one of law, and that questions presenting only questions of law are not removable under the statute for prejudice and local influence. It is conceded that the questions arising on the bill and answer involve simply the construction of the constitution of the state of Michigan, and the laws and ordinances passed thereunder, and are purely of law. The contention of counsel is that the prejudice and local influence which congress had in mind was that which would operate upon a jury, and that it never could have supposed that a state judge would be affected thereby in deciding questions of law. We are clear that this claim of counsel cannot be supported. The local prejudice clause under discussion begins with the words, "And where a suit is now pending, or which may hereafter be brought," etc. The proper limitation to be put on the meaning of this phrase has been authoritatively stated by the supreme court in the case of In re Pennsylvania Co., 137 U. S. 451, 11 Sup. Ct. Rep. 141, where Mr. Justice Bradley said:

"The fourth clause [the one in question] describes only the special cases comprised in the preceding clauses. The initial words 'and where' are equivalent to the phrase 'and when in any such case.' In effect, they are tantamount to the beginning words of the third clause, namely, 'and when in any suit mentioned in this section.'"

The suits mentioned in this section are suits at law and in equity. It necessarily follows, therefore, that the local prejudice clause relates to both suits at law and in equity. The words of the clause

"at any time before the trial thereof," used in fixing the time within which the removal on account of prejudice or local influence can be made, are relied on as indicating that only suits at law can be removed, because the word "trial" is properly used only with reference to such suits. This view is refuted by the foregoing language of Mr. Justice Bradley, and by the further fact that under the removal act of 1875, which, it is conceded, permitted the removal of causes in equity as well as at law, the same words are used to fix a time within which removals under that act could be made. When the words "trial" and "hearing" are used together, as in the removal acts of 1866 and 1867, the one refers to a trial at common law and the other to a hearing on the merits in chancery, (Car Co. v. Speck, 113 U. S. 84--86, 5 Sup. Ct. Rep. 374;) but when the word "trial" alone is used it includes both trial at common law and hearing in chancery as in the act of 1875.

If the prejudice and local influence clause applies to suits in equity, then congress must have intended to provide against the prejudice of judges as well as of juries, for there are no juries in equity. The contention on behalf of complainant is, therefore, reduced to a claim that it was the intention of congress to save suitors from injustice by a judge in the determination of issues of fact, but not against injustice done by him in deciding issues of law. We do not see why a judge, if influenced improperly against a party, may not yield to such influence as well in his decisions of legal questions as in his conclusions of fact.

The sole reason of the framers of the constitution for including in the judicial power of the United States the right to decide controversies between citizens of different states was a fear of the operation of prejudice or local influence in the tribunals of one state against a citizen of another. It was thereby intended in the administration of justice, both in determining facts and in deciding the law, to secure a judiciary independent of local influences and surroundings. Recognizing this intention on the part of the framers of the constitution, the federal courts exercise an independence of judgment in deciding many questions of state law, and under some circumstances decline to follow the state courts. In the leading case of Burgess v. Seligman, 107 U. S. 33, 2 Sup. Ct. Rep. 21, Mr. Justice Bradley, in discussing the power and duties of the federal courts in administering state laws, spoke for the supreme court as follows:

"The federal courts have an independent jurisdiction in the administration of state laws, co-ordinate with, but not subordinate to, that of the state courts, and are bound to exercise their own judgment as to the meaning and effect of these laws. The existence of the two co-ordinate jurisdictions in the same territory is peculiar, and the result would be inconvenient but for the exercise of mutual respect and deference. Since the ordinary administration of the law is carried on by the state courts, it necessarily happens that by the course of their decisions certain rules are established which become rules of property and action in the state, and have all the effect of law, and which it would be wrong to disturb. This is especially true with regard to the law of real estate and the construction of state constitutions and statutes. Such established rules are often regarded by the federal courts, no less than by the state courts themselves, as authoritative declarations of what the law is;

but where the law has not been thus settled it is the right and duty of the federal courts to exercise their own judgment, as they also always do with reference to the doctrines of commercial law and general jurisprudence. So when contracts and transactions have been entered into, and rights have accrued thereon in a particular state of the decisions, or when there is no decision of the state tribunal, the federal courts properly claim the right to adopt their own interpretation of the law applicable to the case, although a different interpretation may be adopted in the state courts after such rights have accrued. But even in such cases, for the sake of harmony, and to avoid confusion, the federal courts will lean towards an agreement of views with the state courts if the question seems to them balanced with doubt. Acting on these principles, founded as they are on comity and good sense, the courts of the United States, without sacrificing their own dignity as independent tribunals, endeavor to avoid, and in most cases do avoid, any unseemly conflicts with the well-considered decisions of the state courts. As, however, the very object of giving to the national courts jurisdiction to administer the laws of the states in controversies between citizens of different states was to institute independent tribunals, which it might be supposed would be unaffected by local prejudices and sectional views, it would be a dereliction of their duty not to exercise an independent judgment in cases not foreclosed by previous adjudication."

We could have no better evidence than this that one of the objects of the makers of the constitution, in conferring judicial power in controversies between citizens of different states, was to avoid possible injustice to nonresident litigants from the influence of local prejudice on decisions by state courts on pure questions of law. But it is said we are considering a statute, and not the constitution. That is true, but the reason for conferring a constitutional power, and its scope and object, are of controlling importance in construing a statute passed in the exercise of the power. In cases where the right to sue in the federal courts, or the right to remove cases to them, is made to depend only on the fact of diverse citizenship, congress merely assumes the existence of local prejudice, and provides against its dangers to nonresidents, without regard to the actual fact, while in the clause under discussion, congress puts on him who would enjoy its benefit the burden of an affirmative showing. But in either case the evil sought to be avoided by the act of congress was the same as that which led the makers of the constitution to confer the power to pass the act,—possible injustice to nonresident litigants from prejudiced opinions of law as well as from prejudiced conclusions of fact. Neither authority nor federal statute has been cited which makes the distinction between questions of law and questions of fact contended for. If it was the intention of congress to so limit the right of removal, it could have expressed itself in language not to be mistaken, and would not have left the limitation to be inferred from an argumentative construction, which finds no basis either in the words used or in the reason of the provision.

2. The second objection to the order of removal is that the removal was not in time. The statute provides that the petition for removal in a proper cause shall be filed "at any time before the trial thereof." It is said that the supreme court has decided in Fisk v. Henarie, 142 U. S. 459, 12 Sup. Ct. Rep. 207, that the time for removal under this act is the same as that in the act of 1875, and that, under the act of 1875 the petition for removal was required

to be filed before or at the term at which the cause could first be tried, and before the trial thereof. Conceding for the purpose of the argument that the supreme court has, so decided, we are nevertheless of the opinion that the petition for removal in this case was in time. The petition for removal was filed on the 19th day of October, in the September term, which began on the 13th of September. The appearance of the trust company was required, by the order of publication and the notice, to be at the April term, on July 22d. Upon the 13th of August an order pro confesso was taken against the trust company on proof of publication and in default of its appearance. Subsequently, on August 19th, the order pro confesso was by stipulation set aside, and the trust company was allowed to file its answer. The argument on behalf of the city is that, as a decree might have been taken at once on this order pro confesso against the trust company upon the complainant's making the necessary proofs, this would have been a trial on the merits, and therefore a trial could have been had in the April term. It would follow from this that the petition for removal should have been filed at the April term, and, as filed, was too late. If the order pro confesso had been taken on a personal and actual service, the argument would be unanswerable, for it is clear that generally a hearing on a default is a trial, within the meaning of the removal act of 1875. McCallon v. Waterman, 1 Flip. 651. And it is also clear that under the act of 1875 a postponement of the trial by stipulation between counsel beyond a term when either party could demand a trial did not enlarge the time of removal beyond the first possible trial term. Babbitt v. Clark, 103 U. S. 612.

Under the circumstances of this case, the answer to the argument is twofold: First. Under the laws of Michigan, a decree by default against a nonresident brought in by publication only, can be set aside by such nonresident as a matter of right on payment of costs, and his right to answer the complainant's bill and to have a hearing on the merits is absolute. McDonald v. McDonald, 45 Mich. 44, 7 N. W. Rep. 230. A fortiori, it would seem that such a nonresident is entitled to have an order pro confesso before decree set aside, and to file an answer to the bill. Under the act of 1875, a nonresident against whom a decree by default had been rendered on service by publication, and on whose application within a prescribed time agreeably to the laws of the state, a decree was set aside, and his answer filed, was held entitled to file his petition for removal at the term at which the hearing could first be had on his answer. Harter v. Kernochan, 103 U. S. 562. It would seem to follow that, as the trust company in this case as a matter of right could have had the order pro confesso set aside, and it was set aside, the first trial term within which it was required to file its petition for removal under the requirements of the act of 1875 was the term at which a hearing could be had on its answer. Second. There could have been no trial on the order pro confesso, because that order was void. The order could only be valid in case all the steps required by the statute of Michigan in summoning an absent defendant had been literally and exactly complied with. See Colton v. Rupert, 60 Mich.

318, 27 N. W. Rep. 520; Guarantee Trust & Safe Deposit Co. v. Green Cove Springs & M. R. Co., 139 U. S. 137, 11 Sup. Ct. Rep. 512. One of the most important requisites of a service by publication is that it shall correctly state the parties to the suit in which the defendant is summoned, and that it shall correctly state the name of the defendant. In the case of Colton v. Rupert, 60 Mich. 318, 27 N. W. Rep. 520, the suit was by Garrett B. Hunt and Henry S. Cunningham against Palmer Colton, and the defendant, a nonresident, was sought to be brought in by publication. In three of the publications the name of the first complainant was printed "Grant" instead of "Garrett," as contained in the order and in the bill of complaint. It was held by the supreme court of Michigan that the service was void. See, also, Entrekin v. Chambers, 11 Kan. 368; Magoffin v. Mandaville, 28 Miss. 354; Chamberlain v. Blodgett, 96 Mo. 482, 10 S. W. Rep. 44; Whelen v. Weaver, 93 Mo. 430, 6 S. W. Rep. 220; McRee v. Brown, 45 Tex. 503. In the present case the name of the first defendant sued and as given in the order was the "Detroit City Railway." As published, it was "The City Railway," which does not correctly give the corporate name of the company intended to be sued. Again, the name of the defendant, as given in the bill of complaint, was the "Washington Trust Company of the City of New York," and the order of publication was against "The Washington Trust Company," and this was the name in the notice published. The real name of the defendant is "The Washington Trust Company of the City of New York," and as such it is entitled to be sued. The service against it under the name of "The Washington Trust Company" cannot be regarded as valid. The importance attached to corporate names in Michigan is sufficiently shown in the case of People v. Oakland Co. Bank, 1 Doug. (Mich.) 282, where it was held that an act of the legislature repealing the charter of the Bank of Oakland County could not be considered to be the repeal of the charter of the president, directors, and company of the Oakland County Bank It is quite true that by coming in with its answer the trust company waived all defects in the service, and could not now be heard to object that it is not properly in court. That, however, is aside from the point we are considering, which is whether, when the order pro confesso was taken, the trust company was then before the court, so as to make a default decree against it possible. If it was not legally served, then it was not in court, and there could have been no trial of its case until after it had filed its answer. For these reasons the appearance of the trust company must be regarded as voluntary, and the question whether, by an order pro confesso, the right of a defendant to remove for local prejudice is cut off, is not in the case.

The answer of the trust company was filed on the 19th of August. Chancery rule No. 27 of the circuit courts of Michigan gives the complainant 20 days in which to allege exceptions against the answer, at which time, if no exceptions are filed, the answer is deemed sufficient. By chancery rule No. 45, 20 days after the answer is deemed sufficient are given to the complainant to file a general replication putting the case at issue. If no replication is filed the cause stands

for hearing on bill and answer. Forty days from the 19th of August brings us down to the 28th of September,—15 days after the beginning of the September term. The case could not have been regularly tried before the 28th of September as against the trust company, the removing defendant. It is said that the complainant might have set the case down for hearing on bill and answer, waiving its right to allege exceptions or to file a replication, and therefore the cause could have been tried before the 13th of September, in the April term. It is sufficient answer to this claim to say that the complainant did not waive its right not to have a hearing on bill and answer until after the beginning of the September term. As, on the one hand, a waiver of either party under the act of 1875 could not postpone the time at which a cause could first be tried for the purpose of removal under that act, so, clearly, the possible waiver of either party, not in fact made, could not be construed to advance the time of trial so as to defeat the right of removal before the cause could regularly be tried. It is true that on the 26th of August the complainant served notice on the defendants, stating that the case would be brought on for hearing on bill and answer at the September term. This was certainly not a waiver of the right of complainant to delay a hearing until the September term. The petition for removal was filed at the September term, and before the trial of the cause. It therefore follows that it was in time in any view which may be taken of the holding of the supreme court in Fisk v. Henarie, 142 U. S. 459, 12 Sup. Ct. Rep. 207.

In our opinion, however, the decision of the supreme court in Fisk v. Henarie is not to be given the meaning contended for by counsel for the complainant. In that case the cause was removed from a state court to a federal court under the act of 1888, after it had been three times tried in the state court. The contention on the part of the removing defendants was that the words in this act, "at any time before the trial thereof," used in regard to removal on the ground of prejudice or local influence, were, in effect, "at any time before the final trial thereof," and were to be given the same meaning as the words of the act of July 27, 1866, and the act of March 2, 1867, "at any time before the trial or final hearing of the suit," under which language it had often been ruled that it was not too late to apply for a removal after trials which had been set aside by the trial court or by an appellate court. The chief justice, in giving the opinion of the court, refers to the omission of the word "final" in the acts of 1887 and 1888, and points out that in this respect the language is like that of the act of 1875, in which the words are, "before or at the term at which said cause could be first tried and before the trial thereof." The chief justice says:

"This has been construed to mean the first term at which the cause is in law triable,—the first term at which the cause would stand for trial, if the parties had taken the usual steps as to pleadings and other preparations; and it has also been decided that there cannot be a removal after a hearing on a demurrer to the complaint because it does not state facts sufficient to constitute a cause of action."

After quoting the language of the act of 1887, carried into the act of 1888, the chief justice continues:

"In view of the repeated decisions of this court in exposition of the acts of 1866 and 1867 and 1875, it is not to be doubted that congress, recognizing the interpretation placed on the word 'final' in the connection in which it was used in the prior acts and the settled construction of the act of 1875, deliberately changed the language, 'at any time before the final hearing or trial of the suit,' or 'at any time before the trial or final hearing of the cause,' to read, 'at any time before the trial thereof,' as in the act of 1875, which required the petition to be filed before or at the term at which the cause could be first tried, and before the trial thereof. The attempt was manifest to restrain the volume of litigation pouring into the federal courts, and return to the standard of the judiciary act, and to effect this in part by resorting to the language used in the act of 1875 as its meaning had been determined by judicial interpretation. This is more obvious in view of the fact that the act of March 3, 1887, was evidently intended to restrain the jurisdiction of the circuit court, as we have heretofore held."

Two members of the court—Mr. Justice Field and Mr. Justice Harlan—dissented. In their opinion, the language "any time before the trial" meant the same as in the acts of 1866 and 1867; that is, "at any time before the final trial." The question at issue in the case, therefore, was whether the trial referred to in the act was a final trial or a first trial. The majority of the court held that, because the words "before the trial thereof" had been used in the act of 1875 in connection with words which left no doubt that there they meant the first trial, therefore the same words in the act of 1887 must be taken to have the same meaning. We do not understand from the opinion, however, that the majority of the court intended to incorporate bodily into the acts of 1887 and 1888, from the act of 1875, the words, "before or at the term at which said cause could be first tried." It is not apparent on what grounds this could be done. The act of 1875 fixed the time for removal, not only before the first actual trial, but also before or within the first term when a trial was possible. The supreme court holds that the words "before the trial thereof," in the act of 1887, were taken from the act of 1875. This being the case, the omission in the act of 1887 of the words limiting the period of removal to that before or within the term of possible trial which appear in the act of 1875 would seem to clearly indicate the congressional intention not to impose such a limitation in the subsequent act. The case before the supreme court did not require the construction contended for, and for the reasons stated we do not feel authorized to attribute such a view to that court until some further expression from it on the subject. The words "at any time before the trial" should be given their ordinary meaning, i. e. "at any time before the first trial thereof;" and up to the time of that first trial, whether that occur at one term or another, the right of removal under the local prejudice clause remains. It follows that this cause was removed in time.

3. The next objection to the order of removal is that the affidavit in support of the petition is not legal evidence, because the facts which it states are sworn to on the information and belief of the affiant, and not of his personal knowledge. Neither the order removing nor the order remanding a cause is a final order. In re Pennsylvania Co., 137 U. S. 451, 453, 11 Sup. Ct. Rep. 141. The petition for removal is in the nature of an interlocutory motion. It was long the practice in the high court of chancery in England to permit par-

ties to submit at the hearing of interlocutory motions affidavits on belief, provided that the facts were stated upon which such belief was founded. See Bird v. Lake, 1 Hem. & M. 111; 2 Daniell, Ch. Pr. 1509; 1 Daniell, Ch. Pr. 394. And by equity rule 90 the practice of the circuit court is to be regulated by the practice of the high court of chancery in England so far as the same may be applicable. The same practice now prevails in the high court of judicature of England. See Bidder v. Bridges, 26 Ch. Div. 1. In that case one rule provided that the court or judge might make an order for examination of witnesses de bene esse "when the judge is satisfied, and when it shall appear necessary for the purpose of justice;" and it was held that such satisfaction could be produced on affidavits on belief under the following rule:

"Affidavits shall be confined to such facts as the witness is able of his own knowledge to prove, except on interlocutory motions, on which statements as to belief, with the grounds thereof, may be admitted."

We do not think it would be too much to say that the rule thus stated is everywhere in practice, and that for the purpose of a hearing on interlocutory motions it is not necessary that the affiant should have personal knowledge of every fact stated, if the grounds of his belief are sufficiently set forth. Much reliance is placed upon the opinion of Mr. Justice Bradley in the case of In re Pennsylvania Co., supra, where he discussed the amount and kinds of evidence necessary to make local prejudice appear to the court within the meaning and requirements of the clause under consideration. He said:

"Our opinion is that the circuit court must be legally (not merely morally) satisfied of the truth of the allegation that, from prejudice or local influence, the defendant will not be able to obtain justice in a state court. Legal satisfaction requires some proof suitable to the nature of the case; at least an affidavit of a credible person; and a statement of facts in such affidavit, which sufficiently evince the truth of the allegation. The amount and manner of proof in each case must be left to the discretion of the court itself. A perfunctory showing by a formal affidavit of mere belief will not be sufficient. If the petition for removal states the facts on which the allegation is founded, and that petition be proven by the affidavit of a person or persons in whom the court has confidence, this may be regarded as prima facie proof, sufficient to satisfy the conscience of the court. If more should be required by the court, more should be offered. In view of these considerations, we are disposed to think that the proof of prejudice and local influence in this case was not such as the circuit court was bound to regard as satisfactory. The only proof offered was contained in the affidavit of the general manager of the defendant corporation, to the effect that from prejudice and local influence the company would not be able to obtain justice in the court of common pleas for Litchfield county, or any other state court to which, etc. We do not say that, as a matter of law, this affidavit was not sufficient, but only that the court was not bound to regard it so, and might well have regarded it as not sufficient."

An affidavit on belief of a credible person as to the facts showing local prejudice or influence which will prevent the removing party from obtaining justice in the state court, if the grounds of that belief are stated in the affidavit, is "proof suitable to the nature of the case," and a court may therefore be "legally satisfied" therefrom of the truth of the allegations. Such an affidavit is not a "perfunctory

showing by a formal affidavit of mere belief," but is that kind of evidence which for many years has been accepted in all courts of equity on interlocutory motions as a substitute for the direct evidence of witnesses having personal knowledge required in the hearing on the merits of a case. The affidavit in this case is made by Francis H. Page, the secretary of the Washington Trust Company of the City of New York. After a positive averment of prejudice and local influence, he goes on to state that he is secretary of the Washington Trust Company of the City of New York, and that by direction of his company he visited the city of Detroit, to ascertain the condition and situation of the suit, and to protect its interests; that, after a careful and impartial investigation and examination, he has thoroughly familiarized himself with the actual condition of affairs in Detroit in connection with the controversy in this action. The affiant then refers to facts, of which the following are examples: A riot, (of which it may be remarked in passing, the supreme court of Michigan has taken judicial notice;) the conduct of the mayor and council in reference thereto, as evidenced by official records and otherwise; the calling and proceedings of a public meeting; the appointment of a committee by that meeting, and their public acts; the speeches at the public meeting, as evidenced by a stenographic report thereof; extracts from the local press; the issues of a local election and its results; the messages of the mayor; the resolutions of council,— and many other facts, all in the nature of local history, of which an investigation for the purpose would give the affiant reasonably accurate knowledge. His statement of such facts on information and belief, therefore, if he be a credible person, (which we have no reason to doubt,) furnished the court trustworthy legal evidence upon which to dispose of the petition for removal, and, if the facts stated were sufficient, might reasonably and legally satisfy the court of the existence of such prejudice and local influence either against the trust company or in favor of the city in this controversy as to justify the removal of the cause.

4. The final objection urged on behalf of the complainant, to the order of removal, is that the facts stated in the affidavit do not show the necessary prejudice and local influence. The statute directs a removal "when it shall be made to appear to said circuit court that, from prejudice or local influence he (the removing defendant) will not be able to obtain justice in such state court, or in any other state court to which the said defendant may, under the laws of the state, have the right, on account of such prejudice or local influence, to remove said cause." The defendant trust company has no right, under the laws of Michigan, to remove this cause from the Wayne circuit court to any other court of the state on account of prejudice and local influence. This is conceded. That it is within the power and discretion of a Wayne circuit judge to invite a judge from another circuit to hear the case, is not material, because the defendant cannot request it as a matter of right. The inquiry must be limited, therefore, to the existence of such prejudice and local influence as will affect the defendant's getting justice in the Wayne circuit court.

Counsel contend that, inasmuch as a decision of the Wayne circuit court involves only a question of law which the defendant trust company, in the event of an adverse decree, can carry to the supreme court of the state, no showing can be sufficient which does not tend to prove that the decision of the supreme court also will be affected by prejudice and local influence. We do not agree in this view. It rests on the false premise that no injury is done to a party litigant when a court of original jurisdiction, swayed by prejudice or local influence, decides a case against him, if the case involves only an appealable question of law. He is entitled, on general principles, to have his rights justly determined in every tribunal whose aid or protection the law gives him, no matter whether the judgment is to depend on disputed facts or law. It is an injustice to him to be compelled to appeal to a higher court to right a wrong done him by the prejudice of the trial judge. In this cause, the disadvantage to the trust company, in case of an adverse decision by the Wayne circuit court, will be substantial. The mandatory injunction prayed by the city, if granted by the circuit court, would compel the street-railway company, pending the appeal to the supreme court, to tear up its tracks from the streets of the city, and materially injure the mortgage security held by the trust company; and if, on the other hand, a supersedeas bond should be given to stay the enforcement of the decree, the giving of such a heavy bond is a burden which neither the trust company nor its mortgagor should have imposed on it except by a tribunal free from prejudice or local influence.

Coming now to the affidavit, we find in it a positive averment of the existence of prejudice and local influence, as follows:

"Deponent further saith that the said the Washington Trust Company of the City of New York, from prejudice and local influence, will not be able to obtain justice in said circuit court for the county of Wayne, in the state of Michigan, or in any other state court to which the said Washington Trust Company of the City of New York may, under the laws of the state of Michigan, have the right, on account of such prejudice and local influence, to remove said cause; that said prejudice and local influence also exist against the franchises and property involved in said suit, and against the Detroit Citizens' Street-Railway Company, which is in possession of and operating the street railways under such franchises, and through them the said prejudice and local influence exist against the Washington Trust Company of the City of New York, which is the grantee in a deed of trust executed by the said Detroit Citizens' Street-Railway Company to the said the Washington Trust Company of the City of New York, and that said prejudice and local influence exist in favor of the city of Detroit, the complainant in said suit, and is being used by said complainant against the said the Washington Trust Company of the City of New York as said defendant in the said suit."

The affiant then gives a detailed history of the controversy between the street-railway company and the city and the people of Detroit, which, for the purpose of this opinion, may be summarized in the following: The Detroit City Railway Company was organized May 9, 1863, and was by ordinance given a franchise to operate a street railway in several main streets of the city for a period of 30 years from its incorporation. In November, 1879, the common council of Detroit by ordinance extended the life of the company's franchise until 1909, which was sixteen years after the time when the company's cor-

porate life, as limited by the constitution of Michigan, must expire. During the year 1890 there had been much public criticism of the railway company because of its poor equipment and service, and its failure to adopt a system of rapid transit. The public feeling thus aroused against the company was increased by the continuous comment in the public press that the stock of the company was largely owned by aliens, and that the railway was operated by persons of foreign birth. January 1, 1891, the Detroit City Railway transferred all its property and franchises to a corporation known as the Detroit Street-Railway Company. In April, 1891, a general strike of the employes of the new company took place, because a few of their number had been discharged. The company would have had no difficulty in supplying new men and operating its lines if a mob of citizens and strikers had not forcibly resisted the running of its cars. Policemen were placed on the company's cars for a short time to protect them from attack, when the common council of the city passed a resolution formally protesting against the use of the police force. The mayor was appealed to by the company, and he replied that he had no power in the premises. Several riots took place, in which the property and employes of the company were attacked and injured. The only official act of the mayor in connection with the riots was to issue a proclamation calling upon all persons to preserve the peace, which he took no steps to enforce. The supreme court of Michigan, in the case of Geist v. Railway Co., 51 N. W. Rep. 1112, took judicial notice of this riot, and set aside a verdict against the company because of a reference to it in the speech of counsel for the plaintiff. The words of the court are:

"In view of the great excitement and anger of the populace, which culminated in mob violence against the railway company but a few weeks before the trial, of which we cannot fail to take judicial knowledge as a matter of current history, this remark might have revived the feeling, and had a prejudicial effect upon the jury against the defendant."

A large public meeting, attended by citizens of all classes, was held to express sympathy with the strikers, and to denounce the railway company. The common council and the mayor publicly called upon the railway company to submit the matters in difference between it and its former employes to arbitration, and, in order to avoid further loss from lawless violence in the absence of adequate police protection, the company was compelled to do so. Soon after these occurrences, the public demand for rapid transit became so great that in June following the railway company agreed to put in the necessary plant if its franchise should be extended from 1909 to 1920. The common council accordingly passed an ordinance granting the extension. The people of the city were much incensed at this action of the council, and charges of bribery against the members of the council and the company were made, and reiterated in the public press. The conditions imposed on the company in the ordinance were declared to be insufficient. A very large indignation mass meeting, the call for which was signed by prominent citizens, was held in July, 1891, and was attended by the mayor and nearly all the aldermen. The railway company was denounced in all the speeches.

The attorney for the company, in attempting to present the case of his client, was interrupted and shouted down. Resolutions were passed, stating that the franchises of the company would expire in May, 1893, and that they could be made to realize a million dollars or more to the city treasury; demanding that the present company give the public rapid transit, and, on failure to immediately comply, that the franchises be condemned, and put up for sale to the highest bidder; and protesting against the action of the council in extending the franchises, and demanding that the mayor veto the ordinance. A committee of 50 leading citizens was appointed to present the protest to the mayor and the common council, and to take action in the courts or otherwise in respect to the street franchises. The mayor vetoed the ordinance in a message in which he reiterated the sentiment of the indignation meeting, as expressed in its resolutions. The public feeling against the street-railway company had become so great in the fall of 1891 that the then owners of the stock sold out to a new company, owned and controlled by leading citizens of Detroit; but this change of ownership was denounced in the public press as a change from one set of monopolists to another. One article, quoted in the affidavit, concludes as follows:

"Simmered down, it looks as if the street-railway corporations which have been making so much trouble for the citizens, and creating so much scandal in the municipality, had simply been reinforced by a cordon of other great and powerful corporations; that they are endeavoring to disarm public suspicion of their intentions until they close all avenues of escape, then to draw their lines closer and closer, then to swoop down and get what the old company tried but failed to,—extension of franchises in the streets, worth millions, for nothing."

In a communication to all the papers of the city, the secretary of the mayor charged that the ownership of the railway company had not in fact changed, but that the present seeming owners were purely conveniences for the old stockholders. The term of the mayor ended January 1, 1892, and an election for his successor took place in November, 1891. The leading issue of the campaign was the street-railway question, and the mayor was re-elected, although a majority of the electors of Detroit are members of the political party opposed to that of the mayor. The citizens' committee of 50, appointed at the meeting in July, 1891, issued an address in this campaign, asking the public to vote against 9 aldermen, because they were said to be favorable to the street-railway company. The result was the election of a majority of the council on an anti-street-railway platform. The mayor, in his official messages to the common council, and in open letters to the leading newspapers, which were published during the winter of 1891–92, frequently called attention to the great pecuniary value of the street-railway franchise to the city, if it could only sell the same to the highest bidder, and to the opinion of leading lawyers that the franchise of the present company would expire in May, 1893, or earlier. He recommended the employment of counsel in addition to the regular attorneys of the city to act on her behalf. This course was also recommended by the citizens' committee of 50, and in January, 1892, they suggested the names of two lawyers for such employment. The mayor

reported that he had retained the gentlemen named for the city. The council tabled a resolution authorizing him to do so, and considerable discussion as to his authority in this matter was had. One of counsel retained for the city withdrew from the case in March, 1892. Thereupon the mayor, in a message to the council, charged that such withdrawal was the result of "subornation of treason" by the railway company. In the same month the council passed an ordinance limiting the life of the franchise of the railway company to May, 1893, and repealing the ordinance of 1879, by which the franchise of the railway had been extended to 1909. A few days later the bill in this case was filed.

The city of Detroit is a municipal corporation, forming a large part of the county of Wayne. The judges of the Wayne circuit court are elected by the qualified electors of Wayne county, once in six years. The terms of the present judges expire December 31, 1893, but their successors will be elected on the first Monday in April next. The present judges are all candidates for re-election. The affidavit closes with this positive statement:

"And this deponent further saith that all the above-stated prejudice and local influence in favor of the city of Detroit, complainant in this suit, and against the Detroit Citizens' Street-Railway Company, operate upon and adversely to the holders of bonds issued by said Detroit Citizens' Street-Railway Company to the Washington Trust Company of the City of New York, by reason of the latter's relation as trustee of the Detroit Citizens' Street-Railway Company, and trustee for the holders of bonds of said street-railway company. That by reason of the prejudice and ill will existing against the said street-railway company, and, through it, against the Washington Trust Company of the City of New York, as above set forth, and the determination of the public and the public authorities that said railway company shall be defeated, if possible, in anything which it undertakes or proposes, the judges of the Wayne circuit court are placed in a most trying and embarrassing situation, and are subject to constant and persistent importunity and public pressure; and justice requires that they should not be called upon to determine the questions in issue between the city of Detroit and said railway company, in which the Washington Trust Company of the City of New York is interested."

No affidavit has been tendered in contradiction of the facts here set forth. Judge Jackson, in the case of Whelan v. Railroad Co., 35 Fed. Rep. 849, and in Thouron v. Railroad Co., 38 Fed. Rep. 673, expressed the opinion that on a hearing of this kind affidavits could not be introduced to contradict or rebut the affidavit filed in support of the petition for removal on the issue of the existence of prejudice and local influence. Counsel for the city state that they acquiesce in this decision of Judge Jackson, and have therefore filed no rebutting affidavits. Whether the language of the supreme court in the case of In re Pennsylvania Co., supra, does not shake the decision of Judge Jackson as authority upon this point we are not called upon now to consider or decide. Suffice it to say that no affidavits contradicting the averments of the Page affidavit have been filed, and the action of the court must be predicated upon that alone.

If the facts stated in the affidavit, of which we have only mentioned a part, do not show prejudice and local influence in the community of the city of Detroit against the defendants in this case

and in favor of the city as complainant, then it is difficult to imagine facts that would. It is very clear that the citizens of Detroit generally are impressed with a feeling that the street-railway company has abused its privileges; that the continued enjoyment by it of the franchises will be an injustice to the city, and will deprive the city of a very large sum of money which it may acquire by the sale of these franchises to the highest bidder in the coming spring; and that the feeling has ripened into a conviction that the company has no rights in the streets after May, 1893. Whether such public feeling is due to misconduct of the railway company, and may be justified, is not here the question. For the purpose of this argument, such justification may be conceded. With that we have nothing to do. All that we hold is that the community of Detroit have prejudged the case now before us, and, therefore, that prejudice and local influence in favor of the city and against the defendants, including the trust company, do exist.

It is contended by counsel, however, that, even if prejudice and local influence be shown, there is no evidence that by reason thereof the defendant will not obtain justice from the judges of the Wayne circuit court. The "justice" which the defendant must be prevented from obtaining in the state court to entitle him to a removal is certainly not a judgment or decree in his favor. The phrase does not refer to any particular result in the case, but rather to the influences which will operate upon the tribunal in deciding it. The "justice" which defendant has the right to obtain is a hearing and decision by a court wholly free from, and not exposed to the effect of, prejudice and local influence. If it is made to appear to the United States court that prejudice and local influence do exist, which would have a natural tendency to operate directly on the state court, and furnish an interested motive for the judges to decide the case against the petitioning defendant, it is the duty of the United States court to grant the removal, without any inquiry into the fact whether the particular state judges before whom the case is pending could and would rise above such prejudice and local influence, and decide the case unmoved by any personal benefit or disadvantage which would follow their decision. In a majority of cases, doubtless, the state judges would do their duty without fear or favor, but the petitioning defendant is not to be exposed to the chance that prejudice and local influence may work against him. The existence of local influence, and its natural tendency to operate upon the court, being shown, the tribunal is no longer one in which, in the sense of the removal statute, "justice" can be obtained.

A decision in this case adverse to the city of Detroit would probably cause many electors of the city in the approaching judicial election, convinced of the righteousness of the city's cause, to vote against the judge rendering the decision; and no judge could be unconscious of that fact in passing upon the case. We quite agree with counsel when they say that there is nothing here to show that the judges of the Wayne circuit court would not rise above influences of a personal character, and render a just decision; but the adverse in-

fluences of a personal nature are present, and in such a case we must presume a human weakness in all judges to prevent injustice from the frailty of a few. It is by force of a presumption of like character that all judges are held to be disqualified because of a pecuniary interest in the event of a suit. At common law the ownership of a single share of stock in a corporation, which is party to a suit, absolutely disqualifies a judge to hear it. Dimes v. Junction Canal, 3 H. L. Cas. 759. It is held by some courts that where a judge is a taxpayer of a county he cannot hear a case in which the county is interested. Peck v. Freeholders, 21 N. J. Law, 656; Pearce v. Atwood, 13 Mass. 324. No one claims that in many of such cases the judge is not able to discard utterly from his consideration of the merits of the case every motive of pecuniary interest, but the policy of the law forbids that litigants should be exposed to the possibility of bias arising therefrom. If disqualification is presumed in a judge because of a pecuniary interest in the suit, however small, we think it reasonable, under a statute in terms framed to protect nonresident litigants from injustice arising from prejudice and local influence, to presume that judges, dependent for their election and continuance in office upon the suffrages of a community, are disqualified to hear and determine a legal controversy between a nonresident and that community, when it is clearly shown that the community has prejudged the case, and would be likely to visit the judges, in case of an adverse decision, with its ill will. Without such a presumption as this, the statute would be a dead letter in all cases to be heard by a judge without a jury, for, in the nature of things, direct proof that a judge would be influenced by public sentiment and a desire for re-election would be impossible. Congress could never have intended the federal judges to pass on the personal qualities of an individual state judge every time an application is made to remove a suit in equity from a state court under the statute. Congress did, in the clause under discussion, compel the nonresident to make proof of prejudice and local influence, which, if it exists, can be easily shown; but when it is shown the presumption of its injurious influence upon a nonresident's case must follow. This presumption is the basis of the constitutional provision for a federal judiciary in diverse citizenship cases. Mr. Justice Miller states it in his lectures on the Constitution as follows, (pages 332, 333:)

"The reason for this, as has been frequently said by commentators and courts, was the fear in the minds of the makers of the constitution that local prejudice likely to arise in favor of a man sued in the courts of his own state would result in unfair decisions against his nonresident adversary. * * * It was thought that a court owing allegiance to and receiving its commission from the United States would be a safer tribunal than a court which was commissioned by a state, which could be influenced by a vote of its citizens, and might be swayed more or less in its decisions from the absolute principles of justice."

It is said that at common law prejudice was never a ground for challenge to a judge. That is true. Interest was the only ground of disqualification. Favor would not be presumed in a judge, and it was, at common law, no ground for excepting to a judge that he was related to either party. In re Dodge & Stevenson Manuf'g

Co., 77 N. Y. 101, 112; Inter Brookes and the Earl of Rivers, Hardr. 503. But public opinion has grown more sensitive, and now by statute in most of the states relationship to the parties, and several other grounds unknown at the common law, disqualify a judge. In several states a party may, under the statute, except to a judge for personal prejudice or bias, and the affidavit of the excepting party asserting the existence of such bias has, under some statutes of this kind, been held to be conclusive evidence thereof. Carrow v. People, 113 Ill. 550; Smelzer v. Lockhart, 97 Ind. 315; Turner v. Hitchcock, 20 Iowa, 310; Runals v. Brown, 11 Wis. 185. The fact, if it be a fact, that there is no provision in the laws of any of the states for removals on the ground that prejudice and local influence in the community affect the judge, has no weight in considering a federal statute of removals, the reason for which we have several times alluded to.

Counsel insist that we must impugn the judicial integrity of the judges of the Wayne circuit court to reach a conclusion that, by reason of prejudice and local influence, the defendant cannot obtain justice in that court. This does not at all follow. We entertain the highest respect for our brother judges of the state court, as we ought, for those exercising concurrent jurisdiction with us. By our conclusion here, we no more reflect upon them than did the supreme court of errors of New Jersey reflect upon the great jurist Chief Justice Hornblower when it held that he was disqualified to render the judgment he had rendered in a suit by the freeholders of Essex county on the bond of a defaulting official, because he was a taxpayer of that county, (Peck v. Freeholders, 21 N. J. Law, 656,) or than did the house of lords reflect on the lord chancellor of England, Earl Cottenham, when it held that he was disqualified to render the judgment he had rendered in a suit against a canal company, because he held a few shares of its stock. Men may be unconsciously influenced by personal motives, and public policy will not trust any judge, however great and pure, when such motives are present. Said Chief Justice Bell in Moses v. Julian, 45 N. H. 52:

"The most perfect integrity that can be in judges is no hindrance why the parties, who have causes before them, may not challenge them, or except against them, and why they ought not of their own accord, to abstain from hearing causes in which they may have some interest, or where there may be some just ground for suspecting them; and they themselves are obliged to declare the causes which may render them suspected, if the parties are ignorant of them; for, although a judge may be above the weakness of suffering himself to be biased or corrupted, and may have resolution enough to render justice against his own relations, and in other cases where it may be lawful for the parties to except against the judges, yet they ought to mistrust themselves, and not draw upon themselves the just reproach of a rash proceeding which would be, in effect, a real misdemeanor. Dom. Pub. Law, Lib. 2, tit. 1, § 214."

Nor, in reaching this conclusion, do we attack the whole system of an elective judiciary, as was claimed in argument. We simply hold that, under extraordinary circumstances, judges elected by a community must be presumed to be affected by a prejudice shown to pervade that entire community, so as to make it unjust to compel

a nonresident to try his controversy with the community before its own judges. If this holding is an attack on the system of an elective judiciary, then it is the constitution and laws of the United States which are responsible for the attack, and not the courts which administer them. The motion to remand is denied.