## MONTGOMERY COUNTY v. COCHRAN et al.

### (Circuit Court, M. D. Alabama. July 1, 1902.)

1. REMOVAL OF CAUSES—EX PARTE ORDER—FURTHER CONSIDERATION.

    Though an order for removal of a cause, under the provision of 25 Stat. c. 866, § 2, therefor, when it shall be made to appear to the court that from prejudice or local influence a nonresident defendant will be unable to obtain justice in the state court, is made ex parte, plaintiff may afterwards traverse the petition for removal, and be heard as to the grounds for removal.

2. SAME—PREJUDICE OR LOCAL INFLUENCE—CASE TO BE TRIED BY JUDGE.

    Whether a cause shall be removed to a federal court under the provision therefor of 25 Stat. c. 866, § 2, when it shall be made to appear to the court that from prejudice or local influences a nonresident defendant will be unable to obtain justice in the state court, is independent of the fact that the case is to be tried by a judge, the section providing for removal of suits at law or in equity, and is not affected by the character or ability of the judges, but depends on the existence of prejudice or local influence, to which the judge is exposed.

3. SAME—RESIDENT AND NONRESIDENT DEFENDANTS.

    Under 25 Stat. c. 866, § 2, providing that where a suit is pending in a state court, in which there is a controversy between a citizen of that state and a citizen of another state, any defendant, being such citizen of another state, may remove it for prejudice or local influence, such right of removal is not affected by another defendant and plaintiff being citizens of the state where suit is brought.

4. SAME—FACTS SHOWING PREJUDICE AND LOCAL INFLUENCE.

    Prejudice and local influence authorizing removal of cause to federal court is shown, the action being by a county on the bond of its treasurer, whose surety was a nonresident surety company, for loss of a large sum obtained by sale of bonds for improvement of roads and building of bridges, there being a question whether the responsibility for the loss was on the treasurer or the board of revenue, composed of prominent citizens of the county, who control its local affairs, there being a prejudice against the treasurer and the bank in which the money was deposited, and there being a widespread feeling that the surety should not defend.

5. SAME—WAIVER OF JURY IN STATE COURT.

    Waiver of jury in state court does not affect the right to a jury after removal of cause to the federal court.

## On Motion to Remand Cause to State Court.

On the 21st day of January, 1902, the county of Montgomery brought suit in the city court of Montgomery against "John J. Cochran as principal, and the Fidelity & Deposit Company of Maryland, a corporation existing under the laws of the state of Maryland, as surety," for breaches of Cochran's official bond as county treasurer. The complaint contains seven counts, alleging, in substance, that the treasurer lost the moneys of the county by placing them on general deposit with the banking house of Josiah Morris & Co., which failed. Among the moneys thus lost is the sum of $111,109.58, the proceeds of the sale of $100,000 of county bonds issued by the board of revenue, which it is alleged came into Cochran's hands as treasurer. The bonds were issued under the authority of an act approved December 13, 1901, for "building and improving the public roads of the county upon a permanent and well-considered system, and for erecting bridges in said county." Acts 1900–1901, p. 703. The fourth section of that act reads as follows:

¶ 2. Removal of cause to federal court for prejudice or local influence, see note to P. Schwenk & Co. v. Strang, 8 C. C. A. 95.

"Sec. 4. Be it further enacted, that the board of revenue of said county are hereby authorized to negotiate and sell such bonds as are issued by them by virtue of this act, but said bonds shall not be sold for less than par (100 cents on the dollar) and the proceeds of said bonds shall be paid over to and kept by the treasurer of said county and applied to pay for the building of and improving the public roads of the county upon a permanent and well considered system, and for erecting bridges in said county; such use, payment and application of said proceeds to be under the direction and by authority of said board of revenue of said county of Montgomery, and the said county treasurer to be responsible for the safe keeping of all the proceeds accruing from the sale of said bonds which may come into his hands in his official capacity, the same as for other county funds or money in his hands as such treasurer; and there shall be no commissions paid said county treasurer for disbursing the funds accruing from the sale of the bonds named in this act." Id. p. 705.

On the 15th day of February, 1902, at the last term of the circuit court of the United States for the Middle district of Alabama, the Fidelity & Deposit Company presented to the court the following petition for the removal of said cause into the circuit court of the United States for the Middle district of Alabama, to wit:

"The County of Montgomery, Plaintiff, versus John J. Cochran as Principal, and the Fidelity & Deposit Company of Maryland, a Corporation under the Laws of the State of Maryland, as Surety, Defendants. In the Circuit Court of the United States for the Middle District of Alabama. Petition for the Removal of Said Cause from the City Court of Montgomery, Alabama.

"To the Honorable the Judges of the Circuit Court of the United States for the Middle District of Alabama: Your petitioner, the above-named Fidelity & Deposit Company of Maryland, a corporation existing under the laws of the state of Maryland, respectfully shows to this honorable court that the county of Montgomery, as plaintiff, brought suit of a civil nature, in the city court of Montgomery county, Alabama, on the 21st day of January, 1902, against your petitioner, the Fidelity & Deposit Company of Maryland, and one John J. Cochran, and that the matter or amount in dispute exceeds the sum or value of two thousand ($2,000.00) dollars, exclusive of interest and costs; that service of process in said case was made on your petitioner on the 24th day of January, 1902, and that the time for pleading or demurring to said complaint is within thirty days after the said service, and that your petitioner has heretofore, viz., on the fifteenth day of February, 1902, appeared in said city court of Montgomery and demurred to said complaint, and a copy of said complaint and the demurrer thereto is hereto attached and made a part hereof, and the first trial term for said case is in the month of April, 1902; that the said controversy is between citizens of different states, in that the plaintiff was at the time of the commencement of said suit, and still is, a citizen of the state of Alabama; and that your petitioner, the Fidelity & Deposit Company of Maryland, was at the time of the commencement of this suit, and still is, a citizen of the state of Maryland, and of no other state, having its principal office in the city of Baltimore in the said state of Maryland; and that the other defendant in said suit is a citizen of the said state of Alabama; and that your petitioner desires to remove this suit, which is now pending and undetermined in said state court, before the trial thereof, into the circuit court of the United States, to be held in the Middle district of Alabama. Your petitioner further shows unto this honorable court that from prejudice and local influence in favor of the plaintiff, and adverse to this defendant, it will not be able to obtain justice in said court, or in any other state court, to which the defendant may, under the laws of this state, have a right to remove said cause, on account of such prejudice or local influence. And, in this connection, your petitioner further shows unto your honors that said above-mentioned suit is a suit instituted by a political subdivision of the state of Alabama, to wit, Montgomery county, against the said John J. Cochran, the treasurer of said Montgomery county, and your petitioner, a surety company, as surety on the official bond

of said John J. Cochran, as treasurer of said Montgomery county, and that said suit is instituted by said county of Montgomery to recover the sum of $120,000.00 (one hundred and twenty thousand dollars), which last-mentioned sum is the penalty of said bond, alleged to have been deposited by the said John J. Cochran, as such county treasurer, in the banking house of Josiah Morris & Co., of Montgomery, Alabama, whereby the said sum is alleged to have been lost to the said county of Montgomery by reason of the failure and insolvency of the said Josiah Morris & Co., and that by reason of the nature of said suit all the residents and citizens of said Montgomery county have a direct interest in the recovery by the said plaintiff of the amount claimed. And in this connection your petitioner further shows unto your honors that the other defendant in this suit, John J. Cochran, is practically financially irresponsible, in that his assets, your petitioner is informed and believes and so states, are less than five thousand dollars, and that the said Cochran is therefore practically only a nominal party to the said suit, and that your petitioner, the said Fidelity & Deposit Company of Maryland, would be obliged practically to meet the whole claim should judgment be recovered against the defendants; and your petitioner further shows that from time to time heretofore there have been statements made in the public press to the effect that your petitioner is and will be held liable for the amount claimed in said suit, and will have to pay the same, and that said publications as made in papers published in the city of Montgomery, and in other cities in the state of Alabama, have been circulated throughout all the counties in the said state of Alabama, whereby a local prejudice against your petitioner, and influence in favor of the plaintiff in said suit, has been created throughout the whole state of Alabama. Petitioner further avers that the amount sought to be recovered in said suit was, at the time of the failure of said Josiah Morris & Co., substantially all the funds of the plaintiff, and the inconvenience to said plaintiff from its inability to use said money for public purposes has caused a feeling of prejudice against your petitioner, not only in the county of Montgomery, but in other parts of the state of Alabama. Petitioner further avers that the matter of a change of venue in said case is one of discretion on the part of the judge of said city court, and not one of right belonging to said petitioner, and, even if said discretion should be exercised in favor of the removal of said cause to some other county, yet petitioner is informed and believes, and upon said information and belief states, that the wide publicity and notoriety given to this cause and the issues involved therein would operate in any county or court of the state of Alabama to prejudice the rights of this petitioner. And petitioner further avers that the said petitioner is now the surety on bonds of many state and county officers throughout the whole state of Alabama, and that the decision in the present case will be regarded as probably constituting a precedent in any future case or cases which may be brought against your petitioner on said bonds, by reason of which there will necessarily exist a local prejudice against your petitioner in this case in any county of the state of Alabama in which said case should be tried. Petitioner further avers that the said banking house of Josiah Morris & Co. at the time of its failure was largely indebted, viz., about nine hundred thousand dollars, and that this indebtedness was due, and much the larger part of it is still due, to various persons residing in different parts of the state of Alabama, including the city council of Montgomery; that the said Josiah Morris & Co. secured an agreement with its respective creditors for an extension of time within which to pay the amount due to them, respectively, and the said Josiah Morris & Co. has failed to make the second of the payments thus agreed on, and there seems to be no present prospect of any further payments by the said Josiah Morris & Co. to its creditors, by reason of which, as petitioner is informed and believes, and on such information and belief states, that the suit brought against petitioner has been in some way identified or intermingled with the affairs of said Josiah Morris & Co. in the minds of the people, and in the supposed identity of the interests of the said Josiah Morris & Co. and petitioner in the matters referred to there will exist in any court of the said state of Alabama in which said case could be tried a local prejudice against your petitioner. Wherefore your petitioner prays that an

order or decree may be made and entered directing and commanding that the trial of said cause be removed from said city court of Montgomery into this honorable court, and petitioner will ever pray, etc.

"Watts, Troy & Caffey, Attorneys for Petitioner."

Attached to this petition was an affidavit, which, omitting caption, etc., reads as follows:

"Before me, Thomas G. Jones, judge of said court, personally appeared Thomas A. Whelan, who is known to me, and who, being duly sworn, on oath deposes and says that he is the vice president of the Fidelity & Deposit Company of Maryland, the above-named petitioner, in the above-entitled cause, which is now pending in the city court of the county of Montgomery and state of Alabama, and authorized to make this affidavit and act in this matter for petitioner, and that from prejudice and local influence the said petitioner will not be able to obtain justice in said state court, or in any other state court to which it may, under the laws of said state, have the right, on account of said prejudice and local influence, to remove said cause; and, further, that all the matters and facts stated in the above petition to be true, are true; and that all matters stated on information and belief are true to the best of his knowledge, information, and belief.

"Thomas A. Whelan.

"Subscribed and sworn to before me on this the 15th day of February, 1902.

"Thos. G. Jones, Judge."

On examination of this sworn petition, for the reasons stated in the opinion, the court made the order of removal without notice to the plaintiff. A duly certified copy of the petition and order having been duly transmitted to the clerk of the state, he thereupon certified the record to this court. On the 6th day of March, 1902, the plaintiff filed in the clerk's office of the circuit court of the United States its motion to remand the cause to the city court of Montgomery, and substantially on the following grounds: (1) The petition for removal was made by only one of the defendants. It did not show such state of facts as would authorize removal of cause on account of prejudice or local influence. (2) The plaintiff, and John J. Cochran, a codefendant of the surety, are both citizens of the state of Alabama, wherefore there is no jurisdiction. (3) Because it appears on the face of the record "that no jury trial was demanded by either of the parties, and that thereby both waived a jury trial, as provided by the rules of practice of the city court of Montgomery, thus making it the duty of said court to try said cause without the intervention of a jury." (4) That "there exists no prejudice in the mind of the judge of the city court against either of the defendants in said cause, nor can any local influence be brought to bear that could influence or prevent said judge of said city court from giving equal and exact justice to the defendants and the plaintiff in said cause." (5) "Because the judge of the city court of Montgomery is a man of highest character for integrity, a judge profoundly learned in the law, without prejudice against the defendants or either of them, and incapable of being influenced by any local sentiment, if such existed, which could tend to bias his judicial opinion."

The answer to the petition for removal, filed on the same day as the motion to remand, and sworn to by the clerk of the board of revenue, admits the statements of the petition as to the nature of the suit, residence of the parties, and what had been done therein in the state court. It reiterates the statement that a jury trial had been waived, because neither party had demanded a jury within the time prescribed by the rules of that court. It denies that there is any "prejudice or local influence in favor of the plaintiff either in Montgomery county, or city court of Montgomery, or in any other state court to which defendant might, under the laws of the state, remove said cause, on account of prejudice or local influence adverse to either of the defendants." It is further stated: "Plaintiff denies that all of the citizens of Montgomery county have a direct interest in the recovery by plaintiff in the amount claimed, but says and alleges that all of the citizens who are taxpayers in said county have a direct interest in the recovery by plaintiff in the amount sued for." Plaintiff admits that the judge of the city court of Montgomery is a citizen and taxpayer of Montgomery county, "but would

further show unto this honorable court that one of the judges of this court is also a citizen and taxpayer in said county, but denies that either of said judges have any prejudice against either of the said defendants, or that any local influence, if any such existed, could have weight with said judges." It is denied that Cochran is financially irresponsible, or that his assets are less than five thousand dollars, and alleged "the truth to be that Cochran is worth the sum of more than ten thousand dollars, and is more than a nominal defendant in this suit." It is admitted that the money sued for, the amount lost by the failure of the banking house of Josiah Morris & Company, was substantially all the funds of the plaintiff then on hand; but it is insisted "this has created no feeling against the defendant other than that it is the duty of the surety company to keep the condition of its obligation, and return the amount lost, and that there is no prejudice or local influence against the defendant." It denies the publication of articles which would create prejudice against the defendants or either of them. The plaintiff does not know the amount of the liabilities of Josiah Morris & Co., "but says that the indebtedness of that firm can have no influence, indirectly or even remotely, for the plaintiff has no sort of interest in the affairs of Josiah Morris & Co., nor does that firm owe the plaintiff anything."

The case came on for trial at the May term of the circuit court, when the plaintiff called attention to the motion to remand and the answer to the petition for removal, and asked to be allowed to offer evidence on the merits, and to be heard thereon, and that the order of removal be revoked, etc. The defendants objected to the further consideration of the merits of the order of removal, on the ground that, the court having acted on evidence satisfactory to it, the plaintiff had now no right to contest the order. The court overruled the objection, and heard evidence of the plaintiff on the merits of the removal; and also the testimony of Whelan, vice president of defendant (Fidelity & Deposit Company of Maryland), to the effect that he formed his opinion as to prejudice by talking with the people here, and the reports of his agents of their investigation of the local situation. At the conclusion of the evidence, the substance of which is fully stated in the opinion, plaintiff again moved to remand the case, insisting on the whole evidence that it was entitled to that order. It appeared from an inspection of the record certified by the state court that, neither of the parties having demanded a jury, the case stood for trial in the state court by the judge, as sole trier of the law and facts.

John G. Finley, J. F. Stallings, and W. L. Martin, for plaintiff.

Thos. H. Watts, Edgar H. Gans, and Thomas A. Whelan, for defendant Fidelity & Deposit Co. of Maryland.

W. W. Hill, for defendant John J. Cochran.

JONES, District Judge (after stating the facts as above). The elaborate arguments of counsel have taken a wide range, but the questions to be decided may be resolved into four: (1) Whether the court, having ordered a removal of the cause ex parte at the last term, could, at that or a subsequent term, rehear the question on the merits, and, if so, whether such hearing is a matter of favor or right. (2) Whether the "prejudice or local influence" act has any application to a case where no personal charge is made against the local judge, and the parties by not demanding a jury have waived a jury trial in the local court, unless it be shown that the "prejudice or local influence" affected the judge. (3) Whether, the suit being by a citizen of Alabama against another citizen of Alabama and a nonresident surety for breaches of an official bond, the court has jurisdiction to remove. (4) Whether, conceding the jurisdiction, the facts presented make a case of "prejudice or local influence" which authorizes a removal of the cause.

1. The order of removal having been made ex parte at the last term upon the statement of facts contained in the verified petition, it was insisted by the defendants that the plaintiff is without right to traverse the facts set forth in the petition, or, now, to call in question the order of removal. Whelan v. Railroad Co. (C. C.) 35 Fed. 849, and other cases following it, are cited in support of this view. The plaintiff relies on Ellison v. Railroad Co., 50 C. C. A. 530, 112 Fed. 805, which holds to the contrary. Congress having power to authorize removals of "controversies between citizens of different states" on that ground alone, the mode of ascertaining "prejudice," making it "to appear," under the present statute, could not be jurisdictional, unless the statute prescribed an exclusive mode. Congress has prescribed no mode. The existence vel non of "prejudice or local influence," as distinguished from the mode of making it "to appear," is a jurisdictional fact under the present statute. It does not predicate jurisdiction here on diverse citizenship alone, but couples with it the further condition of the existence of prejudice or local influence, to be ascertained by the court. If the ascertainment of prejudice or local influence is the ascertainment of a jurisdictional fact, a party to the suit certainly has the right to be heard as to it at some stage of the trial, as much so as upon any other issue of fact which affects his case. It is the duty of the court at any stage of the proceedings to dismiss or remand a suit if it finds that it is without jurisdiction.

Irrespective of what is merely modal and what is jurisdictional, it is quite clear that congress, by its last legislation on this subject, intended to charge the conscience of the removing court with the ascertainment of the existence of prejudice or local influence, and to constrain the court to refuse jurisdiction unless the existence of such prejudice or local influence was "made to appear" to its satisfaction. The whole object of congress in making the change in the former law would be defeated if any other view is taken of the question. Save in the instances where local influence or prejudice is claimed to grow out of notorious matters of local history and the like, of which the court may take judicial notice, how can the judicial mind be satisfied of the existence of prejudice vel non when it has acted ex parte, and then refuses to hear the other side, who offers to prove that the court has been misled or deceived, and that the allegations of fact, from which the existence of prejudice was ascertained, are utterly false? Unless the court hears the parties on such an issue, it cannot know whether the denial, which involves a denial of jurisdiction, is true or false. If it does not know whether the denial is true or false, it cannot know whether it has jurisdiction. This is not the condition of being "legally satisfied," which the supreme court declares the law exacts before it permits the court to take jurisdiction.

It is not meant to declare that the court cannot in any case order a removal ex parte. The act gives it a very broad field of discretion. The facts relied on in some cases, as in this instance, may be so notorious, recent, and so related to local history that a judge might well take judicial notice of them, or at least utilize such knowledge in determining whether from the petition "prejudice or local influence" was sufficiently "made to appear." In a case of that character, the court

might well believe it unnecessary to take up time hearing an issue which the opposite party might not raise. It was upon such considerations the court acted in making the ex parte order here. It was not contemplated, however, that such action could bar the right of the opposite party to traverse the petition for removal, or to be heard thereon, or lessen in any degree the duty of the court to inquire into such matters at his instance. The contrary view involves the denial of a clear right of the plaintiff. The court, therefore, heard the plaintiff, who had not been heard before, on the merits of the order of removal, and, having reopened the matter, allowed both sides to offer evidence, the substance of which is not of importance in this phase of the case.

2. The word "justice" is used but twice in the constitution of the United States. It is first found in the preamble giving the reasons for the formation of the constitution, one of which is declared to be "to establish justice." It is next found in one of the provisions of the constitution intended to effect its purpose,—"to establish justice,"—by requiring persons who "flee from justice" to be delivered up, etc. Necessarily, "to establish justice" the constitution must provide for the exercise of legislative power to that end, and jurisdiction in certain tribunals to construe and enforce the laws thus passed. Accordingly, the constitution provides that legislative power "shall be vested" in congress, and judicial power "shall be vested" in the supreme court and other tribunals to be established by congress, and that the judicial power thus vested "shall extend" to certain matters which the constitution specifies with great particularity. Save as to certain jurisdiction of the supreme court, legislation is necessary, of course, to distribute to any court any part of the judicial power. Among the matters thus committed to the judicial power of the United States are "controversies between citizens of different states." In ascertaining the purpose of the framers of the constitution in extending the judicial power "to controversies between citizens of different states," we must look to the history of the constitution, the causes which led to its adoption, and the evils disclosed by the working of the government under the articles of confederation, which were intended to be remedied by the new instrument. The Federalist declared that one evil which "crowns the defects of the confederation" is "the want of a judiciary power." This "want of a judiciary power" developed numberless ills, not the least of which was the inability of the government to protect the equality of the rights of "citizens of different states" when a citizen of one state litigated in the courts of a state with a citizen thereof.

It is a matter of common knowledge, at least among all well-informed persons, that at the time of the formation of the constitution there was a prevalent opinion that "the stranger in a strange land" might not have, and often did not have, that measure of justice in the courts of a state which was accorded its own citizens. There was no common tribunal, deriving authority and power from the whole people, responsible to them only, which could protect or enforce, or supervise the enforcement of, equality in this respect. There were local jealousies, local interests, and local opinion in the different

states which worked adversely to the nonresident citizen in favor of the resident citizen, who prosecuted in the courts of his own state a complaint against the nonresident citizen. These things caused some bitterness, tended to diminish free intercourse and trade "between citizens of different states," and stood in the way of "a more perfect union." The framers of the constitution in providing for jurisdiction in the federal courts of "controversies between citizens of different states" had in mind to cure the imperfection, in these respects, of the articles of confederation. The purpose was "to establish justice" as to such controversies by authority to be conferred over them on courts deriving their power from the constitution, freed from dependency in any respect upon any local power, and removed as far as possible from the effects of local environment, which might militate against a nonresident in favor of the citizen of the state where the court sat. The purpose was to give the nonresident citizen the right to resort to these courts when he sued the citizen of another state, or to remove his case out of the state court when sued therein by a citizen thereof, in order to avoid local jealousies, interest, or passion which might sway or tempt the decision by the state court in favor of its own citizen. The purpose was to sweep aside the risk of injustice in the local tribunal growing out of the status of a nonresident contending with the home man. The "justice" which the constitution, and laws passed in pursuance thereof, intended to "establish" in such controversies, was to be worked out by giving the nonresident citizen the right, when properly demanded, to remove the trial of his cause from a local court, whenever local interest, prejudice, opinion, or passion might fairly be thought to expose him to the risk of a trial in which he might be put on an unequal footing with, or measured in a different way from, his adversary in the state court, and thus exposed to the hazard of a determination against him, on considerations other than the real merits of the cause. As stated in the very able opinion in City of Detroit v. Detroit City R. Co. (C. C.) 54 Fed. 18, "the justice which the defendant has a right to obtain is a hearing and decision by a court wholly free from, and not exposed to the effect of, prejudice and local influence." It was not the purpose of the constitution, and laws passed to effect its intent, to put the removing party to proof that he could not obtain justice in his particular case, or that he would not, but only that he might not obtain "justice." More than this, in the nature of things, he could not prove in advance; for the contention that he could not or would not obtain "justice" in the particular case could be shown only by test of actual trial in the state court, and then it would be too late to remove. When, therefore, we seek the purpose of the words, "he will not be able to obtain justice in such state court," we must give those words the purpose which, as we have seen, the constitution had in view when it used the word "justice," and gave the federal courts jurisdiction of that particular class of controversies in order "to establish" that "justice." The purpose intended to be effected by the grant of jurisdiction to the federal courts over "controversies between citizens of different states" is stated in broader terms, as to other matters, in section 2 of article 4, which declares: "The citizens of each state

shall be entitled to all the privileges and immunities of citizens in the several states."

Having seen the reasons for the constitutional policy, it is quite plain that the fact that the local judge tries the case without a jury cannot withdraw such a controversy from the influence of the rule. The terms and spirit of the constitution include cases where the judge alone tries the facts, as well as those in which the jury tries the facts. The jurisdiction "extends" to "all cases in law and equity." Both are brought under the same rule, for the same purpose, by the most explicit command of the constitution itself. Apart from this, the operation of prejudice or local influence upon the judge may be far more harmful to the nonresident litigant than when such influences move the jury. A judge can correct the wrongs done by a jury. Their verdict amounts to nothing if it does not have the stamp of his approval. On the other hand, if the judge is improperly moved by "local influence," it is, in many cases, impossible to correct the wrong, and in no case is that difficulty more insurmountable than where he not only determines the law, but is sole trier of the facts. If there is any evidence which can support his finding in such a case, however much it may be opposed to the weight of testimony, his verdict, although it may be induced by "local influence," must stand; for there is no way to review it, which is not the case when the finding only involves the application of the law.

It seems conclusively to follow, from the reasons of the removal statute, that the local judge's fitness was never intended to be inquired into on an application of this sort, and that his uprightness, firmness, or ability, or the reverse, cannot constitute an element of the "prejudice or local influence" against which the legislation sought to guard. The plain policy of the constitution is that, when "prejudice or local influence" is found to exist, the local judge, whether pure and fearless or impure and weak, shall not be put to the test of breasting such obstacles to justice, if the nonresident citizen properly asks for removal of the cause from the state court. It is not for the federal court to inquire into the actual effect of "prejudice or local influence" upon the local judge. The nonresident litigant defendant may do that. If he is not satisfied, he has a remedy by asking for removal. When the matter is brought before the federal court, the question is not what are the qualities of the local judge, nor how far he has been affected by "prejudice or local influence," but whether they exist, and he is exposed to them. If these influences exist, and he is exposed to them, and they are such as naturally might tempt or influence him to favor the resident citizen in his court, the case is made out, in the constitutional sense, where the nonresident is not "able to obtain justice" in such state court, regardless of the ability of the local judge to surmount the "local influences," or how they actually affect him. "Justice in cases of this sort should not only be above reproach, but beyond all suspicion." 2 Story, Const. p. 493, § 1691.

Certainly, in a case like this, where no personal complaint is made of the judge of the local court, it would not be proper in any event to enter into any inquiry as to his merits as a judge. I may go further, and say, if the attitude of a state judge or his disposition towards

116 F.—63

litigants—no outside "prejudice or local influence" being alleged—can ever be inquired into in any case, to make out the existence of "prejudice or local influence," something more must appear. than dislike on his part to particular individuals or favor on his part to particular individuals. The application for removal would have to go further, and show that such dislike or favor on his part in some way grew out of the fact that one of the parties is a resident citizen and the other is not. When there is no local influence or prejudice in the home of the resident litigant which would exert pressure on the court against the nonresident, or tempt the court to give an unfair advantage to the resident litigant, the state of the local judge's mind, unless it grows out of or is based on prejudice on account of diverse citizenship, cannot constitute "prejudice or local influence," within the meaning of the statute. A case is then presented where the nonresident defendant, like any other suitor in the court, and regardless of whence he comes, is equally exposed with the resident to the infirmities of the judge. These are not the evils which the local prejudice act was designed to remedy. If this is not the true rule, the "prejudice or local influence" act could be perverted, in any case of attempted removal, whenever it suited the malevolence or needs of the nonresident, into practical impeachment and trial of the state judge, by federal authority, for acts and conduct which do not constitute any offense against the constitution and laws of the United States, and for which the local judge cannot be called in question anywhere or by any authority, save in the tribunals of the state whose justice he administers.

3. It is insisted that congress has no power to authorize the removal of this suit, because the defendant is a citizen of the same state as the plaintiff, and, as the suit could not be originally brought in this court, it cannot be removed here. The supreme court has foreclosed inquiry as to the power of congress in this matter. Gaines v. Fuentes, 92 U. S. 10, 23 L. Ed. 524. The only question is, has it exercised the power? Black's Dillon on Removal of Causes, referring to some earlier decisions shortly after the passage of the act of 1887 which denied the right of removal, in cases like this, when any of the defendants were citizens of the same state as the plaintiff, says: "But it is now thought that this construction does violence to the language of the act giving the right of removal to 'any defendant, being such citizen of another state.'" And the "rule now recognized (so far as it can be regarded as settled without an explicit ruling of the supreme court of the United States) is that any defendant, if he is a citizen of a state other than that in which the suit is brought, may remove it to a federal court on the ground of local prejudice, although there are other defendants who are citizens of the same state in which the suit is pending." In support of this statement, he cites a number of decisions. The weight of authority is certainly in favor of the text.

When the words of this particular clause of the act plainly authorize the removal of this case, if we give them anything like their ordinary and plain meaning, what warrant is there for straining the language and violently wresting a different meaning? If a construction denying the right of removal can be worked out, it can be supported only by showing that the spirit and purposes of the act, as a whole,

force the imputation of such intent, notwithstanding the sweeping language the legislators use as to this particular matter. It is a cardinal rule of construction that every word and term of the statute must be given some effect, if it can fairly and reasonably be done. No construction which denies effect to particular parts of an act is justifiable, unless the language and purpose of the act, as a whole, force such a conclusion to prevent the defeat of the legislative will, as deduced from the body of the whole act. Sections 1 and 2 of the act to correct the enrollment of the act of 1887 are the only provisions of the removal law which have any bearing on the question under consideration. The sum requisite in removals under the local prejudice act not being mentioned in section 2, but that section expressly referring to cases in which original jurisdiction is given the circuit court "by the preceding section," it naturally follows, as held by the supreme court, that the limitation as to value fixed in section 1 inhered in the jurisdiction, as to any case which the defendant might remove on account of prejudice or local influence. Ex parte Pennsylvania Co., 137 U. S. 451, 11 Sup. Ct. 141, 34 L. Ed. 738.

The changes made in the original law, as to prejudice or local influence, substituted the conscience of the court for that of the litigant in determining the removal, confined the right of removal to the defendant, required the petition to be filed in the federal court, increased the jurisdictional amount, and required the further allegation that justice could not be had in any other state courts to which the case could be transferred as of right. Apart from these alterations, there is not a word in the revision act on this subject which denotes an intent or purpose to otherwise restrain the right given to "any" nonresident defendant, in a controversy between a citizen of the state in which the suit is brought and a citizen of another state, to remove such a suit into the circuit court, etc. As to the right given to "any defendant," it seems to be broader than the original act. Giving this clause of the act the construction put upon it in Re Pennsylvania Co., supra, as to the words "and where," and reading them as the supreme court declares they must be read, "and when in any suit mentioned in this section," we encounter in the local prejudice statute the command that "when, in any suit" mentioned in section 2, there is a "controversy between a citizen of the state in which the suit is brought and a citizen of another state, any defendant, being such citizen of another state, may remove the suit." By this clause an independent right of removal is given, in any of the suits described in the prior clauses of the second section, not dependent upon the conditions there prescribed for ordinary removals, but dependent solely upon the ascertainment of prejudice or local influence. Congress intended, where local prejudice intervened in the suits named, to give a new or further right of removal to "any defendant," etc. This clause, to use the language in Hess v. Reynolds, 113 U. S. 80, 5 Sup. Ct. 380, 28 L. Ed. 927, furnishes "its own peculiar cause of removal." To hold otherwise is to render the local prejudice clause meaningless; for, if it does not give "any defendant" any right of removal other than that already specifically provided in the prior clauses of the section, this last clause would have no effect whatever. The legislators had in mind, when this particular

clause was written, that prejudice or local influence was an obstacle to justice, and they intended, when it existed against "any" nonresident, in the class of cases mentioned in section 2, to provide a remedy for "any defendant," though he might not be entitled to that remedy under other provisions of the act, in the absence of prejudice or local influence. If this was not the purpose, why did congress drop the carefully guarded provisions and limitations for dealing with the suits and controversies particularly enumerated and classified in the earlier parts of this section of the revision act, and employ, as regards "prejudice or local influence," the sweeping language, "any defendant, being such citizen of another state, may remove such suit"? Moser v. Newman, 6 Bing. 556; Lehman, Durr & Co. v. Robinson, 59 Ala. 238; The Paulina v. U. S., 7 Cranch, 52, 3 L. Ed. 266; Rawlings v. Jennings, 13 Ves. 39; Rich v. Keyser, 54 Pa. 86. "If there be material alteration in the language used in the different clauses, it is to be inferred that the legislature knew how to use terms applicable to the subject-matter." Potter, Dwar. St. 198.

Congress has power to enact that a nonresident defendant, when sued by a citizen of another state in the home court of the latter, may remove the suit on account of prejudice or local influence, although it does not involve a controversy "wholly between citizens of different states, or is one which cannot be fully determined" as between the nonresident and a citizen of that state, because a citizen of the same state as the plaintiff is joined as a codefendant with the nonresident defendant who seeks removal. This seems to be the intent of the present clause. Obeying its plain words effectuates a valuable right which the constitution favors. Can it be said either that congress did not know what it intended, or said what it did not mean? The court feels compelled to hold, on the reason of the statute as well as its peremptory language, that the fact that the defendant Cochran and the plaintiff are both citizens of Alabama is no bar to the right of the nonresident defendant to remove the suit. Whether or not there should be a remand as to Cochran need not be considered. Neither he nor the plaintiff has asked it, and it seems to be conceded, tacitly, at least, that, if the other defendant is properly here, he is also.

It is not necessary to determine whether this case presents a controversy which, in view of section 39 of the Alabama Code of 1896, is "wholly between citizens of different states and can be fully determined as between them." That section declares:

"When two or more persons are jointly bound by judgment, bond, covenant or promise in writing of any description whatsoever, the obligation or promise is in law several as well as joint."

It is argued, in view of this section, that the liability of the surety "is several as well as joint," on the face of the complaint; that, so far as regards the surety's promise to the county, there arises a controversy which is "wholly between citizens of different states," or "can be fully determined as between them"; and that the right to remove such controversy cannot be taken from the defendant by the Alabama plaintiff's bringing a joint action against the nonresident defendant and the principal in the court of the state where the principal and plaintiff reside.

4. What are the salient features of the case now before the court? Is there anything in the transaction and the relation thereto of the parties to the controversy which would naturally arouse "prejudice or local influence" adverse to the nonresident defendant? It is apparent from scanning the petition for removal and the allegations of the complaint that it involves local matters of great public interest. The suit concerns a heavy financial loss to the people of the county. How the loss happened, who was responsible for it, and what the remedy, are topics which have been prominent in the minds of the people from the day of the loss, and will continue to be discussed until this litigation is ended. The suit is by the county against the county treasurer and the surety upon his official bond. It is alleged the treasurer lost all the funds of the county, amounting to the large sum of $130,000, by unlawfully depositing them with the banking house of Josiah Morris & Co. His relations to the banking house are prominent throughout the complaint. One of the allegations is that, the board of revenue having sold bonds to Josiah Morris & Co., the treasurer, who had given a general power of attorney to Kohn, who was also an employé of that banking house, allowed Kohn to take the check of that house, drawn on itself in favor of the treasurer, to procure the delivery of the bonds, which being refused, Kohn returned with a paper acknowledging the receipt by the treasurer from the board of revenue of $111,109.58, the price of the bonds, upon which they were delivered, and afterwards knowingly permitted Kohn to deposit the check with the banking house of Josiah Morris & Co., and knowingly allowed the banking house to convert to its own use these funds of the county. This charge of conversion, if true, amounted to a felony on the part of the treasurer and those concerned, and made a complaint of the gravest moral character against that official. As the surety cannot be liable unless the treasurer is, whatever prejudice arose towards the treasurer from the accusation necessarily reacted upon the surety, at least so far as its defense was concerned. The irritation and feeling caused by the loss is rendered more intense because the proceeds of the bonds, a very large sum, were intended to be devoted to the improvement of roads and the building of bridges, a matter which had long been agitated and involved in a large degree the prosperity and social progress of the people of the county. The contemplated scheme of improvements, "upon a permanent and well-considered system," necessarily came to a standstill, and with it disappointment of the hopes of the people. If the county should lose the suit, the contemplated improvements must be abandoned altogether, unless another sum of equal amount is raised for the improvement of roads and bridges. This would place a double burden upon the taxpayers, for the debt evidenced by the bonds still exists and must be paid.

A glance at the fourth section of the act authorizing the issue of the bonds leaves no doubt that the nonresident surety's defense will be predicated upon its terms,—a defense that it was the duty of the board of revenue to sell and deliver the bonds, and then only for cash, and "pay over" the proceeds in money to the treasurer; that, if Kohn was intrusted to see to the collection of the check, he was the agent

of the board, not of the treasurer; that the surety is not responsible unless the proceeds "come into the hands" of the treasurer, etc. The controversy as to this, morally speaking, though not legally, is directly between that board and the surety. Such defense, if successful, will involve the board of revenue, consisting of five prominent citizens of the county, who control its local affairs and largely determine its policies, in official dereliction, and subject them to heavy personal liability for the loss of the bonds. Certainly the board of revenue has something at stake, and is not idle. It controls this suit. The law gives it that power, and it directs the attorneys who prosecute the litigation. The answer to the petition for removal, containing a denial of "prejudice or local influence," was put in by the authority of the board, and is sworn to by the clerk of the board. Naturally the members of the board desire to save themselves from personal loss and official blame. Its power and that of its friends has been and will be exerted to that end. This can only be effected by getting a judgment in favor of the county. To accomplish this they must beat down the surety's defense. It is admitted that the treasurer is unable to respond for as much as a tenth of the loss. This board is a powerful "local influence," which, for reasons in no wise involved in the law or contract of suretyship, exerts the strong pressure of official power against the successful assertion of whatever defenses the non-resident may interpose. Why do the members of the board insist on remanding the cause? Is it that they believe the circumstances and local surroundings favor them, if the case is tried in the state court? The inference is not strained that they believe it to their interest and that of the county to keep this nonresident in the local court, for they are striving to effect that by their motion to remand. Why is it to their interest to keep it in the local court, if they do not rely on prejudice or local influence to aid in defeating the nonresident?

The minute and remote personal interest individual taxpayers of the county have in its ordinary contracts or ordinary losses of public funds might not usually stir them to active measures against those thought to be responsible for the loss. Here the large loss, the debt incurred by the issue of the bonds still remaining to be paid, the public improvements brought to a standstill, every ride over the bad roads it was contemplated to improve, stir every taxpayer to keen feeling about the suit, and convert him into an active advocate for reimbursing the county out of the pockets of the nonresident surety. Certainly this large body of taxpayers constitute a powerful "local influence" adverse to the surety. A week before this suit was removed the grand jury of the county was in session, certainly investigating the matter of these transactions to some extent. Its report made on the very day of removal, and published next day in the daily papers here, suggested the propriety, evidently in view of the defense the Fidelity & Deposit Company was making, of refusing to take it hereafter on official bonds in this county. The grand jury of a county usually reflects local sentiment in a large degree, and its action is strong evidence of the prevailing feeling throughout the county that the defense of the suit was at least reprehensible, and ought to be resented. This certainly tended to create prejudice against the person of the

nonresident defendant, if it did not arouse resentment against it as to the subject-matter of the litigation.

It is natural that every official in the county, the probate judge, the sheriff, the tax collector, the tax assessor, the clerk of the circuit court, and the clerk of the city court of Montgomery, who have heard these things discussed and live in the atmosphere of public opinion thus created, and all of whom have official as well as personal power and prestige, should share the prevailing sentiment. Whether conscious of it or not, it is evident that these gentlemen are strongly imbued with the general view. Surely, they have and exert a "local influence" in favor of the plaintiff. They see no cause for removal of the suit. They do not conceal their opinion that there is no justification for it in existing conditions. They all testify, in substance, that they know the people generally throughout the county, have talked with them about the matter, and do not believe there is any "prejudice or local influence" against the defendant, although they state the general opinion of the people is that the Fidelity & Deposit Company ought to be made to pay the amount of the loss; that, as a litigant, it is not popular, though as a bond company it is. These witnesses also express the opinion that there was no prejudice against the defendant growing out of the failure of the banking house of Josiah Morris & Co., and its connection with the matter of the loss of the funds. The correctness of this view is much easier stated than proved. It must be borne in mind that the plaintiff's whole case rests upon transactions of the treasurer with that banking house. Kohn, an employé of the banking house, was also agent of the treasurer. Kohn, as agent of the bank, is alleged to have gotten the bonds from the board. Kohn, as agent of the treasurer, is alleged to have put the proceeds in the bank. It is not a strained, but a natural, inference from the facts that the bona fides of the check transaction, the motives for it, and the dealings of the treasurer with the bank, and of the bank with the board, have been prominent in the public mind and discussed during the year elapsing between the failure of the bank and the bringing of this suit. It is difficult in discussing one phase of the transaction to ignore others. The prejudice aroused proceeds on all phases. Thus, the surety is connected in the public mind with the sins of the bank and the prejudices against it. This bank owed nearly a million dollars when it failed, and was shown by the affidavit for removal, which in this particular is not denied, to be the depository both of the city and county. It is natural there should be irritation, apart from the loss occasioned by the failure, from the bank's not fulfilling its promise to pay an installment to creditors for forbearance. The surety stands for a person who is charged with having lost money for the county in unlawful dealings with the bank, and public sentiment insists on reimbursement which can only be had out of the surety. It is almost impossible to keep the bank, and the prejudice resulting against it and the treasurer, out of the minds of the people in considering the defense of the surety, who is pursued for losses occasioned by the combined failure of the bank and the breach of duty of the principal in his dealings with it. These constitute the foundation of the legal wrong and fault upon which the county bases liability of the

surety. It is to be noted that none of the evidence upon which the court is invited to review and revoke the order of removal disputes any of the important facts of the transaction.

We have, then, the county of Montgomery striving to retrieve a heavy loss; the prestige, influence, and interest of the board of revenue exerted to get a judgment for the county, and prevent one for the defendant, which would put blame and personal liability on its members; the sympathy, if not more, of other chief officials of the county with the policy of the board; the direct financial interest of all the taxpayers; the prejudice resulting in the minds of all citizens, whether taxpayers or not, from the disappointed hopes of an improved system of roads and bridges; the prejudice which grows out of the manner and instrumentalities of the loss; and the well-nigh universal opinion among the people of the county that the surety should not defend the suit,—all arrayed against the nonresident and its defense. All these combined interests, prejudices, and influences fight for the plaintiff, and against the defense and the defendants. Is it not highly improbable, with this volume of prejudice or local influence entering into the controversy, that the nonresident surety would stand in the trial of the merits of its defense on an equal footing, in the constitutional sense, with the home plaintiff in the local court?

I do not deny or underestimate the honesty of these prominent officials of the county who have testified to the nonexistence of "prejudice or local influence." It is a singular fact that the best of men are often unconscious of any bias or prejudice which shapes their views, and are as sincere and conscientious in denying the existence of prejudice as men can be. It is not by such opinions, however, that the issue here is to be weighed. That would be leaving to a vote of the county officials whether there was "local influence," whether the people of the county are prejudiced, whether this case should be remanded. To permit this would be to call "local influence" itself to the judgment seat,—take its advice on its own existence and power to harm. All these are questions addressed solely to the conscience and judgment of the court, upon the admitted facts of the case.

We see the effects of the laws of gravitation, but who has seen the power which attracts one atom to another? We see and feel the force of the winds and waves, but the power which puts them in motion we do not see. So it is as to the existence of "prejudice" or the extent of "local influence." We can ascertain their life and strength only by taking facts and conditions which we can see and know, and ascertaining, by our knowledge of human nature, the direction in which the interests, motives, and habits of men impel them under the existing conditions. When these factors are given, the existence of "local influence or prejudice," and the harm they may do, must be determined by reasoning from known cause to natural and ordinary effect. Here the causes are known. They are many and plain. Their ordinary and natural effect is not matter of doubt.

The city court is of statutory origin. Neither it nor its judge can invoke the protection given courts and judges created by the constitution. State v. Sayre, 118 Ala. 1, 24 South. 89. The court was created in response to the wishes of the people of this county, and will

be abolished when the people demand it. The salary of the judge is paid by the county, and its representatives in the legislature can reduce it. The term is for six years and until a successor qualifies. The governor nominates three candidates to the senate, and must appoint as judge the candidate selected by the majority of the senate. Local favor and power are predominant in procuring a certificate of eligibility, for that is the legal effect of the governor's nomination, and control very largely the selection by the senate. No candidate has ever been nominated who was not acceptable to the people of the county, and none has ever been elected by the senate who labored under the burden of local disfavor. Disfavor, or even lack of popularity, is a well-nigh insuperable barrier, no matter how shining the character or merits of the individual, to getting or retaining the office. If the judge thus selected and retained in office should, as sole trier of the law and facts, decide a suit adversely to the people of the county, involving a large loss to them, when the popular opinion is fixed that such a decision would be unjust, and that the right is the other way, the judge would be in danger of incurring popular enmity or disfavor. This would threaten him in his tenure and in other ways. No judge in deciding such a case as this, in which the whole community is deeply interested financially, and has fixed opinions in favor of the plaintiff, could fail to realize the effect which such a decision in favor of a nonresident defendant might have upon his personal fortunes. Because some judges might succumb to "local influence" in such contingencies, the constitution, through the removal act, provides that all judges thus circumstanced fall within the class which shall not try the controversy, if the nonresident properly asks to remove it. City of Detroit v. Detroit City R. Co. (C. C.) 54 Fed. 1; City of Tacoma v. Wright (C. C.) 84 Fed. 836; Smith v. Lumber Co. (C. C.) 46 Fed. 819; Hall v. Agricultural Works (C. C.) 48 Fed. 599.

Misunderstanding of the principles upon which the constitution and laws proceed and zeal of counsel alone pardon the personal equation of judges which formed such a prominent part of the argument of counsel for plaintiff. It is formally set up in the record that "one of the judges of this court"—who happens to sit alone in this case—is a citizen and taxpayer of the county of Montgomery as well as the judge of the city court. Of itself, the fact cannot be of any legal significance. Why, then, is it put in the record? It is part of the suggestion that the judge of the United States court is in some way assuming a superiority of judicial qualities over his brother in the state court in trying this case. It is said in Ex parte State Bar Ass'n, 92 Ala. 177, 8 South. 768, 12 L. R. A. 134: "It can never rest in the discretion of a judge whether he will sit in a given cause. If he is not disqualified under the constitution, it is his duty to sit." There are exceptions to the rule stated so absolutely. It is unquestionably true, however, that the law of Alabama does not disqualify a judge because he is a citizen and taxpayer of the county from sitting in a cause to which it is a party. Ex parte State Bar Ass'n, 92 Ala. 117, 8 South. 768, 12 L. R. A. 134; Foreman v. Town of Marianna, 43 Ark. 324; City of Minneapolis v. Wilkin, 30 Minn. 140, 14 N. W. 581; State v. Craig, 80 Me. 85, 13 Atl. 129; In re Guerreno, 69 Cal.

88, 10 Pac. 261; Com. v. Reed, 1 Gray, 472; Commissioners v. Lytle, 3 Ohio, 289; Connecticut v. Braddish, 14 Mass. 296. The law of Alabama would compel a state judge by mandamus to sit in such a cause if he declined to do so, and that was the only reason for refusal. Ex parte State Bar Ass'n, 92 Ala. 117, 8 South. 768, 12 L. R. A. 134. If "one of the judges of this court," or the judge of the city court, declined to sit in this case because he is a citizen and taxpayer, he would "repudiate his duty." 92 Ala. 117. It is not the personality of the local judge with which the constitution deals in the matter of removals, but only the situations in which he may be placed. The fact that the judge is a citizen or taxpayer of the county is not of the slightest consequence so far as concerns his duty to try the case. Are the situations in which state and federal judge find themselves as to this case the same in the rest of its phases? If that is the object of the parallel, it is apparent that it fails. "During good behavior" the federal judge is entirely independent of local favor; at least far more so than his brother judge of the state court. This case has been transferred here, there is no other court to which to transfer it, and a judge of the court cannot "repudiate his duty" to try it. The constitution puts the duty on the one judge to try the case, and excludes the other, not on the idea that the federal judge is purer, firmer, or better than the local judge, but because he is better fortified against the effect of "prejudice or local influence," and therefore freer to resist it. It cannot be a reflection upon a judge that another tribunal, in the discharge of its sworn duty, decides that such judge, conceding his individual purity and high judicial character, falls within a class whom the constitution, on high grounds of public policy, forbids to try certain cases, if the defendant, a nonresident of the state, objects by timely application to remove the cause elsewhere.

5. Counsel agree that the failure to demand a jury in the state court cannot affect the right to a jury trial in the courts of the United States. Of the correctness of this conclusion there can be no doubt. The waiver effected by the state law applies only to the right of jury trial given by the constitution of the state in the state court. The right to a jury trial here depends upon the constitution of the United States. State laws cannot affect this right. The reasons which induced the order of removal make it proper that citizens of the county of Montgomery shall not serve on the jury. The parties will have an opportunity to agree upon the part of the district from which the jurors will be summoned, before any order is made on that subject.

The order of removal was proper, and the motion to remand the cause is therefore denied.